## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    v.

UNITED NEIGHBORHOOD
ORGANIZATION OF CHICAGO and
UNO CHARTER SCHOOL NETWORK,
INC.,

                Defendants.

Case No. 1:14-CV-04044

Judge Thomas M. Durkin

## 180-DAY STATUS REPORT OF
## PATRICIA BROWN HOLMES AS INDEPENDENT MONITOR

Patricia Brown Holmes, retained as Independent Monitor pursuant to the Final Judgment in this matter (Dkt. No. 7), hereby submits this 180-Day Status Report of Patricia Brown Holmes as Independent Monitor as required by the Independent Monitor Agreement.

## INTRODUCTION

On June 2, 2014, the United States Securities and Exchange Commission ("SEC") instituted this action against Defendants United Neighborhood Organization of Chicago ("UNO") and UNO Charter School Network, Inc. ("UNOCSN") (collectively, "Defendants"), alleging various violations of the federal securities laws in connection with a 2011 municipal bond offering. (Compl. ¶ 1, Dkt. 1.) The SEC alleged that Defendants misled investors by failing to disclose that Defendants breached conflict of interest provisions of two grant agreements with the Illinois Department of Commerce and Economic Opportunity ("IDCEO"). (*See, e.g, id.* ¶¶ 19-29.) Specifically, the SEC alleged that Defendants breached their IDCEO grant agreements by entering into transactions with vendors who were owned by family members of UNO's former Chief Operating Officer. (*Id.* ¶¶ 21-22.)

Defendants later consented to an entry of Final Judgment on the claims asserted in the Complaint without admitting or denying any substantive allegations. (Final Judgment as to Defendants, Dkt. 7.) Among other provisions, the Final Judgment enjoined Defendants "from engaging in any 'Conflicted Transaction,' which is defined for the purposes of this Final Judgment as any transaction in which any of the Defendants' officers, directors, agents, employees, and family members use their position for a purpose that is, or gives the appearance of, being motivated by a desire for a private gain, financial or nonfinancial, for themselves or others." (*Id.* at 2.)

To help ensure that Defendants comply with this prohibition against Conflicted Transactions, the Final Judgment ordered Defendants to "retain Patricia Brown Holmes as Independent Monitor … whose jurisdiction shall be limited to reasonably detecting and preventing Conflicted Transactions involving Defendants." (*Id.* at 2-3.) The Independent Monitor's retention lasts 12 months and is subject "to a written agreement" among the Defendants and the Independent Monitor. (*Id.* at 2.) Among other powers and responsibilities, the Final Judgment grants the Independent Monitor the authority: (1) to review any of Defendants' transactions involving the transfer of funds above certain threshold amounts; (2) to prohibit those transactions that the Independent Monitor reasonably believes to be Conflicted Transactions; and (3) to determine whether Defendants' policies and procedures are "reasonably sufficient to detect and prevent Conflicted Transactions." (*Id.* at 3-4.)

The parameters of the Independent Monitor's rights and powers are laid out in the Independent Monitor Agreement ("IMA"). (*See* Executed IMA, attached as Ex. A.) The IMA sets forth the procedures for the Independent Monitor's review of Defendants' transactions and her authority to prohibit any transaction that she reasonably believes to be a Conflicted

2

Transaction. (*Id.* ¶¶ 5-11.) The IMA also provides that "Defendants shall regularly consult the Independent Monitor as to the content of the policies and procedures … that Defendants intend to implement in order to strengthen their internal controls and oversight." (*Id.* ¶ 12.) This same provision grants the Independent Monitor the authority to review policies and procedures "and determine whether they are reasonably sufficient to detect and prevent Conflicted Transactions." (*Id.*)

Finally, the IMA provides that the Independent Monitor "must submit a status report to the Court regarding the discharge of the Independent Monitor's responsibilities within 180 days of the entry of the Final Judgment." (*Id.* ¶ 14.) Consistent with her reporting obligations, the Independent Monitor submits this report to the Court.

**REPORT OF THE INDEPENDENT MONITOR**

**I. Scope of the Independent Monitor's Review**

As a preliminary matter, the Independent Monitor notes that the scope of her review is necessarily limited under the parameters of the Final Judgment and IMA. Most significantly, the Independent Monitor's review of Defendants' transactions with third parties for potential conflicts of interest is dependent on the quality, accuracy, and completeness of information received from Defendants. As an independent outsider, the Monitor unavoidably lacks access to all the facts and circumstances regarding Defendants' transactions. For this reason, the IMA charged Defendants with the responsibility to "[p]rovide all information … reasonably relevant to determining whether Defendants are, or may be engaging in, or are about to engage in, Conflicted Transactions." (*Id.* ¶ 4.) As described further below, the Independent Monitor has put in place policies and procedures designed to obtain all of the necessary information to evaluate whether a given transaction involves conflicts of interest. However, even the most comprehensive policy and procedure relies in some measure on the truthfulness of those who are

3

asked to provide the information. Accordingly, the Independent Monitor's conclusions expressed in this report are predicated on the good faith of the Defendants in complying with their obligations under the Final Judgment and IMA.

Defendants' former in-house counsel, Annie Pike, and their current outside counsel, Mark Jamil of Burke, Burns & Pinelli LLP, have been very responsive to the numerous requests for information to assist the Independent Monitor in the performance of her duties. As far as the Independent Monitor can discern, Defendants have acted in good faith in their efforts to live up to their obligations.

## II.    Review of Transactions

Over the past few months, the Independent Monitor has reviewed hundreds of Defendants' transactions to evaluate whether they fell within the category of "Conflicted Transactions" prohibited by the Final Judgment and IMA. In total, the Independent Monitor has reviewed approximately 350 transactions. This number includes notices describing potential agreements involving recurring expenditure of funds to vendors ("Agreement Notice") and notices describing potential one-time transfers of funds to vendors ("Payment Notice"). In addition, the Independent Monitor has reviewed information related to new hires by UNO and UNOCSN to evaluate whether such hirings constitute Conflicted Transactions.

The Independent Monitor did not find that any of the reviewed transactions constituted Conflicted Transactions, and thus was not required to exercise her authority to prohibit any of the transactions or hires that were submitted for her review. Many of the transactions were approved based on the information initially provided by Defendants and their counsel. For some transactions, the Independent Monitor requested additional information in order to determine whether a potential conflict of interest existed in connection with the proposed transaction. Once the Independent Monitor received and reviewed the supplemental information and determined

that no conflict of interest or potential conflict of interest was present, these transactions were then approved. In addition, the Independent Monitor also used her retained counsel to research the ownership and leadership of the proposed vendors in order independently to evaluate, to the extent possible, whether a conflict of interest existed between Defendants and the vendor.

The transaction review process has been accomplished through the use of procedures designed to obtain critical conflict of interest information. For example, the Independent Monitor drafted a Conflict of Interest Certification form that Defendants now require their vendors to sign.[1] (Conflict of Interest Certification Form, Ex. B.) The form requires a knowledgeable representative of the vendor to certify whether the vendor, the vendor's officers, directors, or employees have "any business, familial, romantic, friendship, or other relationship that could be perceived as potentially influencing a business decision" with any officer, director, or employee of UNO, UNOCSN, or their related entities. (*Id.*) The form also requires the vendor to provide this same information for any of the vendor's subcontractors that will be used in connection with the transaction. (*Id.*) Failure to disclose a relationship that would create an appearance of a conflict of interest can subject the vendor or subcontractor to debarment from future contacts with Defendants. (*Id.*) These Conflict of Interest Certifications have been a key tool in the Independent Monitor's mission to detect and prevent Conflicted Transactions. Moreover, Defendants have committed to continue to use these Conflict of Interest Certification forms after the Independent Monitor's retention has ended as part of their ongoing effort to prevent Conflicted Transactions.

---

[1] For a few large vendors that supply Defendants with essential services (for example, public utilities such as ComEd), Defendants have been unable to obtain a Conflict of Interest Certification form. For these vendors, Defendants perform an independent review of the transactions to determine whether any potential conflicts of interest are present.

Another component of the review process is the Payment Notice and Agreement Notice forms (collectively, "Transaction Notices"). (*See, e.g.,* Payment Notice Form, Ex. C.) The Transaction Notices require a knowledgeable representative of Defendants to provide information regarding the transaction including: (1) the recipient of funds; (2) the purpose of the funds; (3) whether the vendor was selected via a procurement process; and (4) how long the vendor has been in business. (*Id.*) Furthermore, the notice forms require information directly related to conflicts of interest: (1) whether the vendor's owners, officers, or directors also serve as officers or directors of UNO, UNOCSN, or their related entities; and (2) whether the vendor disclosed any potential conflicts on their Conflict of Interest Certification forms. (*Id.*) Finally, each notice form must be signed and certified by a knowledgeable representative of UNO or UNOCSN, who must certify that they have reviewed the transaction for conflicts of interest and have determined that no such conflicts are present. (*Id.*)

With the information provided by the Conflict of Interest forms and Transaction Notice forms, the Independent Monitor and Defendants recently implemented procedures to reduce the paperwork associated with transactions to previously-approved vendors. The IMA authorizes the Independent Monitor to, "at its discretion, waive the notice requirements for transfers of funds … for a specific transaction or a specific category of transactions." (IMA ¶ 8, Ex. A.) Consistent with this provision, the Independent Monitor has approved a "Carve-Out List" of vendors who have previously provided a Conflict of Interest Certification and other information to demonstrate that transactions with the vendor are not Conflicted Transactions. Once the Independent Monitor approves the addition of a vendor's name to the Carve-Out List, Defendants are permitted to enter into transactions with that vendor for 90 days without providing a Payment Notice to the Independent Monitor. During that 90-day period, Defendants

are required to inform the Independent Monitor of any development that could reasonably create the appearance of a conflict of interest with any vendor on the Carve-Out List. At the conclusion of the 90-day period, Defendants must review the vendors on the Carve-Out List and recertify that the vendors do not have any relationships with Defendants' officers, directors, or employees that would result in the occurrence of a Conflicted Transaction.

## III.  Policy Reviews

Before the Final Judgment was entered, the Defendants revised their policies and procedures regarding the detection and prevention of Conflicted Transactions. Specifically, in 2013, Defendants retained the Honorable Wayne R. Andersen (Ret.) to review their policies and procedures and recommend potential changes designed to prevent Conflicted Transactions. Based on those recommendations, Defendants implemented the following policies: (1) an Anti-Nepotism Policy to prevent the appearance of favoritism or family-related conflicts of interest in the workplace; (2) a Code of Conduct and Ethics that prohibited conflicts of interest, described relationships that could pose a conflict of interest problem, and established mandatory reporting requirements for any conflict of interest; (3) a detailed Procurement Policy governing the selection of vendors for certain categories of contracts and purchases; and (4) amended by-laws mandating the creation of a Conflict of Interest policy and requiring officers, directors, and employees with decision-making authority to certify at least annually that they have no conflicts of interest with Defendants' vendors, subcontractors, or employees. (*See* Anti-Nepotism Policies, Ex. D; Codes of Conduct and Ethics, Ex. E; Procurement Policies, Ex. F; By-Laws, Ex. G.) In addition, Defendants have taken steps to conform their practices to the 2013 policy changes. For example, Defendants have required their new hires to fill out Family Relationship Disclosure forms requiring the prospective employee to review the Anti-Nepotism Policy and disclose any

familial or romantic relationships that could create the appearance of a conflict of interest. (*See, e.g.,* Family Relationship Disclosure Form, Ex. H.)

Additionally, Defendants have implemented further policy and procedural changes at the suggestion of the Independent Monitor since signing the IMA. For example, Defendants have adopted an additional provision in their By-Laws requiring their respective Boards to review and approve any proposed transaction involving the expenditure of $250,000 or more. (Conflict of Interest By-Laws, Ex. G at 13-14, 24.) The new by-laws also require that the respective Boards must be given enough information about transactions to satisfy the Board that no actual or potential conflicts of interest exist before approval is given. (*Id.*) The revisions also grant Defendants' Boards the discretion to review any proposed transaction involving the expenditure of less than $250,000. (*Id.*)

Defendants also adopted other changes in consultation with the Independent Monitor in order to obtain conflict of interest information from their officers, directors, and employees. All of Defendants' new hires must complete Family Relationship Disclosure forms in which the signatory must disclose any familial or romantic relationship with any officer, director, or employee of Defendants or their related entities. (Ex. H.) In addition, all of Defendants' officers and directors must complete ownership disclosure forms revealing: (1) any ownership interest of 5% or greater held by the officer, director, or their family members in any entity; and (2) any business or organization in which the officer, director, employee, or any of their family members hold any officer, partner, or other position. (Director and Senior Staff Ownership Disclosure, Ex. I.) Defendants' directors must also complete conflict of interest disclosure forms requiring directors: (1) to affirm their understanding and compliance with the Conflict of Interest Policy;

and (2) disclose any business, financial, familial, or other relationships with outside vendors or Defendants' employees that could pose a conflict of interest problem.

Defendants have also adopted other modifications recommended by the Monitor to strengthen their existing policies. The Anti-Nepotism Policy language was changed in order to clarify and highlight the intent of the original policy: that Defendants will not hire relatives of existing employees where: (1) an employee would supervise or have disciplinary authority over his or her relative; (2) an employee would audit the work of his or her relative; or (3) if the hiring would otherwise create a conflict of interest involving Defendants' officers, directors, or employees or Defendants' outside vendors. (Anti-Nepotism Policies, Ex. D.) In addition, Defendants added language to their Code of Conduct to clarify that the Conflict of Interest Policy applies to Defendants' officers, directors, and any employee with the authority to enter into contracts on Defendants' behalf or any employee with the authority to influence Defendants' contracting decisions. (Codes of Conduct and Ethics, Ex. E, at 3-4, 13-14.) Furthermore, Defendants revised their Procurement Policies to require that responding entities submit a statement disclosing any family, business, or other relationships with Defendants' officers, directors, or employees, or family members of Defendants officers, directors, or employees, that could create an appearance of a conflict of interest. (Procurement Policies, Ex. F at 4, 12.)

Consistent with her responsibilities under the IMA, the Independent Monitor has reviewed Defendants' policies and procedures and determined that as long as they are implemented diligently and in good faith, they are reasonably sufficient to detect and prevent Conflicted Transactions. (IMA ¶ 12, Ex. A.) It is the intent of the Independent Monitor to next focus on having the Defendants further demonstrate that they have conformed their practices in

accordance with these policies in their ongoing effort to detect and prevent Conflicted Transactions.

**IV.    Other Considerations Related to Independent Monitor's Review**

The Independent Monitor would like to alert the Court to a potential issue that has arisen over the past six months between UNO and UNOCSN. UNO and UNOCSN have recently entered into a dispute regarding the contractual agreement that defines the relationship between the two entities. In essence, UNOCSN has announced its intention to terminate the Management Services Agreement with UNO at the conclusion of the agreement's term at the end of the 2014-2015 school year. So far as the Independent Monitor can discern, both UNO and UNOCSN appear committed to fulfilling their obligations under the Independent Monitor Agreement and, as of the date of this report, the Independent Monitor's review does not seem to have been affected. Of course, the Independent Monitor will continue to examine the situation and alert the Court if the dispute threatens the performance of the Independent Monitor's responsibilities.

<u>**CONCLUSION**</u>

Accordingly, since the entry of Final Judgment, it appears that Defendants have fulfilled their responsibilities under the Final Judgment and IMA. The Monitor will continue to closely monitor Defendants' actions throughout the second half of the Monitor's term to ensure that proper incentives are in place and that a rigorous effort is occurring at all levels to prevent Conflicted Transactions. The Independent Monitor will provide another update to the Court at the conclusion of her 12-month term.

Dated: December 1, 2014                      /s/ Patricia Brown Holmes _____

                                                 Patricia Brown Holmes
                                                 233 S. Wacker Drive, Suite 6600
                                                 Chicago, Illinois 60606
                                                 (312) 258-5500 (t)
                                                 (312) 258-5600 (f)
                                                 pholmes@schiffhardin.com

                                                 *Independent Monitor*

11

## <u>CERTIFICATE OF SERVICE</u>

       I certify that on December 1, 2014, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System, which will send notice of the filing to counsel for all parties having appeared of record.

/s/ Patricia Brown Holmes        