IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br> v.<br><br>UNITED NEIGHBORHOOD ORGANIZATION OF CHICAGO and UNO CHARTER SCHOOL NETWORK, INC.,<br><br>        Defendants. | Case No. 1:14-CV-04044<br><br>Judge Thomas M. Durkin |

**FINAL REPORT OF
PATRICIA BROWN HOLMES AS INDEPENDENT MONITOR**

Patricia Brown Holmes, retained as Independent Monitor pursuant to the Final Judgment in this matter (Dkt. No. 7), hereby submits this Final Report as required by the Independent Monitor Agreement.

**I. Background**

On June 2, 2014, the United States Securities and Exchange Commission ("SEC") filed this action against Defendants United Neighborhood Organization of Chicago ("UNO") and UNO Charter School Network, Inc. ("UNOCSN") (collectively, "Defendants"), alleging various violations of the federal securities laws. (Compl. ¶ 1 (Dkt. 1).) The SEC alleged that Defendants misled investors by failing to disclose that Defendants breached conflict of interest provisions of two grant agreements with the Illinois Department of Commerce and Economic Opportunity ("IDCEO"). (*See, e.g., id.* ¶¶ 19-29.) Specifically, the SEC alleged that Defendants breached their IDCEO grant agreements by entering into conflicted transactions with vendors who were owned by family members of UNO's former Chief Operating Officer. (*Id.* ¶¶ 21-22.)

Defendants later consented to an entry of Final Judgment on the claims asserted in the Complaint without admitting or denying any substantive allegations. (Consent of Defendants to Entry of Judgment (Dkt. 4-2); Final Judgment as to Defendants (Dkt. 7).) Among other provisions, the Final Judgment enjoined Defendants "from engaging in any 'Conflicted Transaction,'" which was defined "as any transaction in which any of the Defendants' officers, directors, agents, employees, and family members use their position for a purpose that is, or gives the appearance of being[,] motivated by a desire for a private gain, financial or nonfinancial, for themselves or others." (Dkt. 7 at 2.)

To help ensure that Defendants complied with this prohibition against Conflicted Transactions, the Final Judgment ordered Defendants to "retain Patricia Brown Holmes as Independent Monitor." (*Id.*) The Independent Monitor's jurisdiction was "limited to reasonably detecting and preventing Conflicted Transactions involving Defendants." (*Id.* at 2-3.) The Independent Monitor's retention was subject "to a written agreement" and would last for an initial period of 12 months. (*Id.* at 2.) The Independent Monitor's term was permitted to be extended "for good cause shown." (*See id.*; Consent of Defendants (Dkt. 4-2) at 7-8.)

The Independent Monitor's rights and powers were described in the Independent Monitor Agreement ("IMA"). (*See* Executed IMA (Dkt. 8-1).) The IMA set forth the procedures for the Independent Monitor's review of Defendants' transactions and her authority to prohibit any transaction that she reasonably believed to be a Conflicted Transaction. (*Id.* ¶¶ 5-11.) The IMA further required Defendants to consult the Independent Monitor as to their policies and procedures which they implemented "in order to strengthen their internal controls and oversight." (*Id.* ¶ 12.) The Independent Monitor also had the authority to review Defendants'

2

policies and procedures to "determine whether they are reasonably sufficient to detect and prevent Conflicted Transactions." (*Id.*)

On December 1, 2015, the Independent Monitor filed the 180-Day Status Report (the "180-Day Report") as required under the IMA. (Dkt. 8.) In that submission, the Independent Monitor described the procedures she implemented to review Defendants' transactions for potential conflicts of interest. (*Id.* at 4-7.) The Independent Monitor also notified the Court that she had reviewed Defendants' transactions and had not needed to exercise her authority to prohibit any transaction. (*Id.* at 4.) The 180-Day Report also described the Independent Monitor's review of "Defendants' policies and procedures and determined that as long as they are implemented diligently and in good faith, they are reasonably sufficient to detect and prevent Conflicted Transactions." (*Id.* at 9) Among other changes, Defendants amended their by-laws to require their respective Boards of Directors to review for potential conflicts of interest any proposed transaction involving the expenditure of at least $250,000. (*Id.* at 8.) The by-laws required that the Board be provided enough information about the transaction to satisfy the Board that no actual or potential conflicts of interest exist before the transaction can be authorized. (*Id.*)

On June 30, 2015, the Independent Monitor filed the End-of-Term Status Report ("End-of-Term Report") with the Court. (Dkt. 12.) The Independent Monitor detailed her review of Defendants' transactions and informed the Court that she had not needed to exercise her authority to prohibit any of Defendants' transactions. (*Id.* at 5-7.) The End-of-Term Report also discussed the efforts of Defendants' respective Boards of Directors to implement policies relating to: (1) disclosure of their ownership interests and business affiliations to prevent conflicts; and (2) review transactions involving the expenditure of $250,000 or more for potential

conflicts of interest. (*Id.* at 7-8.) The Independent Monitor also described Defendants' efforts to implement the Anti-Nepotism and Procurement Policies which they had previously adopted on the Independent Monitor's recommendation. (*Id.* at 8-10.) Further, the Independent Monitor notified the Court that the Defendants had agreed to extend the Independent Monitor's term from June 30, 2015 until December 30, 2015 (the "Extension Period"). (*Id.* at 10.) The extension was designed to ensure that Defendants' compliance with the Final Judgment was not affected by "the June 26, 2015 expiration of the Management Services Agreement that previously defined the relationship between the Defendants." (*Id.*) During the Extension Period, the Independent Monitor "assess[ed] whether UNO and UNOCSN [would] continue to implement and follow critical policies and procedures necessary to comply with the Final Judgment in this matter." (*Id.*)

The IMA requires the Independent Monitor to "submit a final report to the Court regarding the discharge of the Independent Monitor's responsibilities" at the end of her term. (Dkt. 8-1 at ¶ 14.) Accordingly, the Independent Monitor submits this Final Report to address matters related to the Independent Monitor's responsibilities. In delivering her Final Report, the Independent Monitor will refer to applicable portions of the 180-Day Report and the End-of-Term Report and hereby incorporates those documents by reference. (Dkt. 8 & 12.)

**II.      Scope of the Independent Monitor's Review**

The Independent Monitor emphasizes that the scope of her review is necessarily limited under the Final Judgment, Consent Judgment, and IMA. Most significantly, the Independent Monitor's review of Defendants' transactions with third parties for potential conflicts of interest is dependent on the quality, accuracy, and completeness of information received from Defendants. As an independent outsider, the Monitor lacks access to all the facts and circumstances regarding Defendants' transactions. Among other limitations, the Independent

4

Monitor has no access to Defendants' offices, personnel files, or financial records. Instead, the IMA required Defendants to "[p]rovide all information … reasonably relevant to determining whether Defendants are, or may be engaging in, or are about to engage in, Conflicted Transactions." (Dkt. 8-1 at ¶ 4.) The Independent Monitor instituted policies and procedures designed to obtain all of the information necessary to assess a given transaction for potential conflicts of interest. However, even the most comprehensive policies and procedures rely in some measure on the truthfulness of those who are asked to provide the information.

Similarly, the Independent Monitor's review of Defendants' implementation of policies and procedures also depends on information received from Defendants. Since the 180-Day Report, the Independent Monitor has requested information from Defendants regarding the measures taken to implement the policies and procedures they developed "in order to strengthen their internal controls and oversight." (*Id.* ¶ 12.) Any assessment of the Defendants' progress in enforcing these new policies relies to some degree on the truthfulness of the individuals who provided the information to the Independent Monitor. Accordingly, the Independent Monitor's conclusions expressed in this report are predicated on the good faith of the Defendants in complying with their obligations under the Final Judgment, Consent Decree, and IMA.

### III. The Independent Monitor's Review of Transactions

Since the filing of the End-of-Term Report, the Independent Monitor has continued to review Defendants' transactions to evaluate whether they fell within the category of "Conflicted Transactions" prohibited by the Final Judgment and IMA. In total, the Independent Monitor has reviewed approximately 430 transactions since the start of her term. This number includes notices describing potential agreements involving recurring expenditure of funds to vendors ("Agreement Notices") and notices describing potential one-time transfers of funds to vendors ("Payment Notices").

The Independent Monitor did not find that any of the reviewed transactions constituted Conflicted Transactions, and thus was not required to exercise her authority to prohibit any of the transactions that were submitted for her review. While many of the Agreement Notices and Payment Notices were approved based on the information initially provided by Defendants and their counsel, the Independent Monitor requested additional information for some transactions to determine whether a potential conflict of interest existed. Once the Independent Monitor received and reviewed the supplemental information and determined that no conflict of interest or potential conflict of interest was present, these transactions were approved. In some instances, the Independent Monitor asked her retained counsel to research the ownership and leadership of the proposed vendors in order independently to evaluate, to the extent possible, whether a conflict of interest existed between Defendants and a particular vendor.

The Independent Monitor's review was facilitated by the use of procedures to obtain important conflict of interest information from Defendants' vendors. (*See* Dkt. 8 at 5-7; Dkt. 12 at 6-7.) Defendants' commitment to use these procedures following the conclusion of the Independent Monitor's review will determine whether Defendants remain in compliance with the Consent Decree's prohibition against Conflicted Transactions.

IV. **Extension Period Policy Implementation Review**

As far as the Independent Monitor can discern, Defendants continued to act in good faith in their efforts to live up to their obligations to detect and prevent Conflicted Transactions during the Extension Period.

A. **Defendants' Boards of Directors**

Defendants' respective Boards of Directors appear to have used their authority under their by-laws to examine certain transactions for potential conflicts of interest. In 2014, both UNO and UNOCSN amended their By-Laws to require their Boards to perform a conflict of

6

interest review of any proposed transaction involving the expenditure of $250,000 or more. (Dkt. 8 at 8; Conflict of Interest By-Laws (Dkt. 8-7) at 13-14, 24.) The Defendants' Boards previously exercised this authority to review transactions. (Dkt. 12 at 7.) During the Extension Period, both UNO and UNOCSN Boards of Directors continued to review eligible transactions for conflicts of interest and, based on their review, approved all such transactions. The transactions reviewed and the decisions reached by the respective Boards are reflected in the Board minutes.

Further, both UNO and UNOCSN have indicated that their officers and directors have submitted the necessary ownership disclosures to avoid conflicts of interest. Defendants required their officers and directors to submit ownership disclosure forms revealing (1) any ownership interest of more than 5% held by the officer/director or their family members in any entity and (2) any business or organization in which the officer/director or any of their family members hold any officer, partner, or other position. (Dkt. 8 at 8; Director and Senior Staff Ownership Disclosure (Dkt. 8-9).) Both UNO and UNOCSN have represented that each of their officers and directors have submitted ownership disclosures during the Extension Period.

### B. Anti-Nepotism Policy

Further, both UNO and UNOCSN have indicated their continued compliance with their Anti-Nepotism Policies. (*See* Dkt. 8 at 9; Anti-Nepotism Policies (Dkt. 8-4); Dkt. 12 at 8-9.) The Anti-Nepotism Policy generally precludes the hiring of relatives of existing employees where: (1) an employee would supervise or have disciplinary authority over his or her relative; (2) an employee would audit the work of his or her relative; or (3) the hiring/promotion of an employee would otherwise create a conflict of interest involving Defendants' officers, directors, or employees or Defendants' outside vendors. (Dkt. 8-4.) To obtain information about potential

family-related conflicts, Defendants require their new hires to complete Family Relationship Disclosure forms in which the signatory must disclose any familial or romantic relationship with any officer, director, or employee of Defendants or their related entities. (Family Relationship Disclosure Form (Dkt. 8-8).) The Independent Monitor previously detailed Defendants' efforts to implement their Anti-Nepotism Policies in the End-of-Term Report. (Dkt. 12 at 8-9.)

Based on the information provided, both UNO and UNOCSN have made efforts to ensure that their hiring complies with their Anti-Nepotism Policies. Since late June 2015, all of UNO's and UNOCSN's new hires have submitted Family Relationship disclosure forms. None of UNO's new hires during this time disclosed the existence of any familial or romantic relationships. Of those who submitted forms to UNOCSN during the Extension Period, approximately 10% disclosed a familial or romantic relationship with UNOCSN (or their related entities') officers, directors, or employees. Upon receiving notice of the relationship, UNOCSN's human resources personnel or its Chief of Schools provided a memorandum acknowledging UNOCSN's awareness of the relationship and explaining, with supporting documentation, why hiring the prospective employee would not violate the Anti-Nepotism Policy. Further, both UNO and UNCOSN have represented that they will remain committed to their previously implemented procedures for monitoring any previously disclosed family relationships among employees.

    **C.    Procurement**

The Independent Monitor also received information regarding Defendants' adherence to their Procurement Policies during the Extension Period. (*See* Dkt. 8 at 9; Procurement Policies (Dkt. 8-6).) Both UNO and UNOCSN represented that all contracts subject to the bid requirements of the Procurement Policy were awarded using a competitive bidding process. Consistent with their Procurement Policy, both UNO and UNOCSN obtained signed Conflict of

Interest Certification forms from each vendor that submitted a proposal or bid during the Extension Period. Further, none of these vendors disclosed the existence of a relationship that would pose a potential conflict of interest with either UNO or UNOCSN.

## V.     End of Independent Monitor's Review

As of the filing of this report, the Independent Monitor's review of Defendants' compliance with the Final Judgment has ended. Although the Independent Monitor's responsibilities have concluded, Defendants are reminded that their duty to refrain from engaging in Conflicted Transactions is a continuing obligation under the Final Judgment and the Consent Decree. The Independent Monitor expresses gratitude to UNO, UNOCSN, their personnel, and their counsel for their assistance.

## **CONCLUSION**

Accordingly, since the entry of Final Judgment, it appears that Defendants have fulfilled their responsibilities under the Final Judgment and IMA.

Dated: December 30, 2015

/s/ Patricia Brown Holmes
Patricia Brown Holmes
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500 (t)
(312) 258-5600 (f)
pholmes@schiffhardin.com

*Independent Monitor*

## **CERTIFICATE OF SERVICE**

      I certify that on December 30, 2015, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System, which will send notice of the filing to counsel for all parties having appeared of record.

                                                                          /s/ Patricia Brown Holmes